# In The United States Court of Federal Claims

No. 09-594T
(Filed:  April 30, 2013)

```
* * * * * * * * * * * * * * * * * * * *    *
                                           *
COLORCON, INC.,                            *
                                           *
           Plaintiff,                      *
                                           *
v.                                         *
                                           *
THE UNITED STATES,                         *
                                           *
           Defendant.                      *
                                           *
* * * * * * * * * * * * * * * * * * * *    *
```

**26 U.S.C. § 483; 26 U.S.C. § 163; Tax Refund; Unstated Interest; Interest Deduction; Deferred Payment; Short-Form Merger; In Lieu of Payment.**

*Herbert Odell,* West Conshohocken, PA, for plaintiff.  *Dustin Covello*, West Conshohocken, PA, of counsel.

*Robert Stoddart*, Tax Division, U.S. Department of Justice, Washington, DC, with whom were *Kathryn Keneally*, Assistant Attorney General, and *David I. Pincus*, Chief, Court of Federal Claims Section, for defendant.

## O P I N I O N

**FIRESTONE**, *Judge.*

In this case, Colorcon, Inc. ("the plaintiff" or "Colorcon"), formerly known as

Berwind Pharmaceutical Services Incorporated ( "BPSI"),[1] seeks a refund for federal

---

[1] This opinion refers to the plaintiff by the name under which it was doing business at the relevant period of time.  From November 19, 1985 to December 5, 2005, the plaintiff was known as BPSI.  On December 5, 2005 the plaintiff changed its name to Colorcon, Inc (effective January 1, 2006).  Joint Statement of Uncontroverted Facts ("Joint Statement") ¶ 1.

income taxes and the related penalty assessed and collected by the United States ("the government" or "the defendant") for the tax year ending December 31, 2002, plus interest.  The plaintiff had claimed an interest deduction in the amount of $31,096,783[2] in connection with a December 31, 2002 payment it made to BPSI's minority shareholder, the David Berwind Trust ("the DB Trust"), following the settlement of two consolidated lawsuits related to a 1999 short-form merger of BPSI under Pennsylvania law.  The DB Trust received a payment of $191,000,000 on December 31, 2002 in connection with a settlement agreement that resolved two consolidated lawsuits arising from the 1999 short-form merger.  In the lawsuits, the DB Trust had sought, among other things, a statutory appraisal for the fair value of the BPSI shares, as well as damages stemming from alleged breaches of fiduciary duties by various BPSI directors.  The DB Trust had also sought an injunction against the short-form merger and a declaration that the short-form merger was void.

The plaintiff asserts in its complaint that it was required to impute interest on the settlement payment because the 1999 short-form merger constituted "a sale or exchange under a contract" within the meaning of Section 483 of the Internal Revenue Code ("IRC").  26 U.S.C. § 483 (2000).  The Internal Revenue Service ("IRS") disallowed the plaintiff's interest deduction and asserted a deficiency in the amount of $10,883,874.  It also assessed a "substantial understatement penalty" in the amount of $2,176,775.  The plaintiff paid the assessed deficiency, penalty, and deficiency interest in the amount of

---

[2] In its initial filing, Colorcon deducted $31,103,795 for interest on the settlement payment.  In its amended filing, Colorcon deducted $31,096,783.

$5,463,576, and timely filed a refund with the IRS. The IRS subsequently disallowed the refund claim, and the plaintiff timely filed an action in this court. Pending before the court are the parties' cross-motions for summary judgment. For the reasons that follow, the plaintiff's motion for summary judgment is **GRANTED** and the government's motion is **DENIED**.

## I.     BACKGROUND

### A.  The Statutory and Regulatory Background

#### 1.   Interest on Certain Deferred Payments under 26 U.S.C. § 483

Congress enacted Section 483 of the IRC in 1964 to require interest imputation on certain contracts under which payments were to be spread out over time. This requirement stemmed from congressional concern that taxpayers were distorting the tax treatment of their transactions by using installment contracts to convert ordinary interest income into capital gain. See S. Rept. No. 830, 88 Cong., 2d Sess. 102 (1964); Solomon v. C. I. R., 570 F.2d 28, 33 (2d Cir. 1977) (describing history of Section 483). Section 483 requires taxpayers to impute interest according to a statutory formula for payments:

> on account of the sale or exchange of property which constitutes part of or all of the sales price and which is due more than 6 months after the date of such sale or exchange under a contract (A) under which some or all of the payments are due more than 1 year after the date of such sale or exchange, and (B) under which there is total unstated interest.

26 U.S.C § 483.[3]  Section 483 has thus been described as applying "blindly," requiring

interest imputation whenever a portion of a payment for the sale or exchange of property

is deferred[4] under the contract for more than one year.

### 2. Short-Form Mergers Under Pennsylvania Law

The Business Corporation Law ("the BCL")[5] of Pennsylvania is the primary

source of law governing for-profit corporations in the state.  See 12 Summ. Pa. Jur. 2d

Business Relationships § 1:4 (2d ed.).  The BCL provides procedures and rules governing

changes to corporate form, including short-form mergers.[6]  Under the BCL, a short-form

merger does not require that the plan of merger or consolidation receive an affirmative

vote of a majority of the shareholders.  Compare 15 Pa. C.S. § 1924(a) (mergers

generally require shareholder vote), with 15 Pa. C.S. § 1924(b)(1)(ii) (plan of merger

does not require shareholder approval if a party to the plan owns 80% or more of the

---

[3] Section 483 defines "total unstated interest" as follows:

> With respect to a contract for the sale or exchange of property, an amount equal to
> the excess of—(1) the sum of the payments to [Section 483] applies which are due
> under the contract, over (2) the sum of the present values of such payments and
> the present values of any interest payments due under the contract.

[4] 26 C.F.R. § 1.483-1(b) defines "Deferred Payments" as "any payment that constitutes all or a
part of the sales price . . . that is due more than 6 months after the date of the sale or exchange."
26 C.F.R. § 1.483-1(b) defines "Sales Price" as "the sum of the amount due under the contract
(other than stated interest) and the amount of any liability included in the amount realized from
the sale or exchange."

[5] 15 Pa. C.S. §§ 1101-4162.

[6] A short-form merger is a statutorily authorized procedure by which the parent corporation can
eliminate the minority shareholders' interest in the enterprise.  See Mitchell Partners, L.P. v. Irex
Corp., 53 A.3d 39, 46 n.6 (Pa. 2012); Franklin A. Gevurtz, Squeeze-Outs and Freeze-Outs in
Limited Liability Companies, 73 Wash. U. L.Q. 497, 537 n.137 (1995).

4

outstanding shares of each class of constituent corporation).  Rather, the short-form

merger "shall be deemed adopted by the subsidiary corporation when it has been adopted

by the board of the parent corporation."  See 15 Pa. C.S. § 1924(b) ("[N]either approval

of the plan by the board of directors of the subsidiary corporation nor execution of

articles of merger or consolidation by the subsidiary corporation shall be necessary."); 15

Pa. C.S. § 1575, Committee Comment 1988 (1988 BCL intended to provide short-form

merger procedure similar to the Delaware certificate of ownership and merger).

Because Pennsylvania's short-form merger statute enables the parent corporation

to eliminate the minority shareholders' interests, disaffected minority shareholders

generally have no right to obtain an injunction against a merger without establishing

fraud or fundamental unfairness.  See 15 Pa. C.S. § 1105; Mitchell Partners, L.P., 53

A.3d at 47.  If shareholders object to the value offered for their shares, the BCL creates

statutory "dissenters rights," 15 Pa. C.S. § 1930, which entitle qualifying shareholders "to

dissent from, and obtain payment of, the fair value of [their] shares in the event of, any

corporate action . . . ."  15 Pa. C.S. § 1571.[7]  The payment is designed as a measure of

---

[7] The Pennsylvania BCL establishes procedures governing dissenters rights in short-form
mergers.  First, the corporation must send notice of the plan or adoption of the short-form merger
to all shareholders who are entitled to dissent and demand payment of the value of their shares.
15 Pa. C.S. § 1575 (notice of demand payment).  After the proposed corporate action has been
effected, the corporation must either provide the dissenting shareholders with the amount
estimated to be the fair value of their shares, or provide notice that no such provision will be
made.  15 Pa. C.S. § 1577.  Upon a receipt of demand for payment from the shareholders, the
corporation then must either give written notice that no remittance under the section would be
made, or the corporation must remit the amount that the corporation estimates to be the fair value
of the shares to those dissenters who have made a demand and who have also deposited their
certificates.  The dissenting shareholder may then send its own estimate of the fair value of the
shares, which is deemed a demand for payment of the amount.  Failure of the shareholder to file
its own estimate within 30 days after the mailing by the corporation of its remittance notice

"the fair value of shares immediately before the effectuation of the corporate action to which the dissenter objects, taking into account all relevant factors, but excluding any appreciation or depreciation in anticipation of the corporate action." 15 Pa. C.S. § 1572. Dissenting shareholders who comply with the procedures for dissenters rights "retain other rights of a shareholder until those rights are modified by effectuation of the proposed corporate action." 15 Pa. C.S. § 1576(c).

### B. Factual Background[8]

#### 1. Origin of the DB Trust's Interest in BPSI

This case arises from a family dispute over the control and ownership of BPSI, a segment of the Berwind Corporation. In 1963 Charles Graham Berwind established four trusts containing stock in the Berwind Corporation for the benefit of his children, including his two sons, David Berwind and Charles Graham Berwind, Jr. ("Graham Berwind"). Joint Statement ¶¶ 2-3. Each trust had three trustees, including the beneficiary and Graham Berwind. Id. ¶ 4.

The Berwind Corporation purchased BPSI, a company specializing in pharmaceutical coatings, in 1978. Id. ¶ 7. As a result of various transactions, the David Berwind Trust ("the DB Trust") came to own 16.4 % of BPSI's common stock, and the

_____

disqualifies the dissenter from receiving more than the amount stated in the corporation's demand notice. 15 Pa. C.S. § 1578 (estimate by dissenter). Thereafter, the corporation may file in court an application for relief requesting that the fair value of the shares be determined by the court. The court may appoint an appraiser to receive evidence and recommend a decision on the issue of fair value. 15 Pa. C.S. § 1579 (valuation proceedings).

[8] Except where otherwise noted, the facts described herein are taken from the parties' Joint Statement, and are not in dispute. See Joint Statement, ECF No. 54.

trusts controlled by Graham Berwind—later organized under the control of the Berwind Group Partners[9]—came to own 83.6% of BPSI's common stock.[10]  Id. ¶¶ 10-11.  In addition, the Berwind Corporation received shares of BPSI Series A preferred stock and a note.  Id. ¶ 8.

The Berwind Group Partners made multiple attempts to consolidate control of the various Berwind business groups.  Between 1976 and 1985 the Berwind Corporation redeemed all of the shares of its common stock that had been held by the DB Trust.  Id. ¶¶ 6, 13.  Although this left the Berwind Group Partners in control of the Berwind Corporation, the DB Trust still retained its 16.4% interest in BPSI.  Id. ¶ 13.  In 1993 and again in 1997, the Berwind Group Partners (through BPSI) tried to purchase the DB Trust's interest in BPSI, id. ¶ 14, but the DB Trust refused to sell.  Id. ¶ 16.

## 2.  BPSI's Interest in ZYAC Holding Corporation

Sometime between 1993 and 1997, ZYAC Holding Corporation ("ZYAC") was formed under the control of the Berwind Group Partners to acquire all of the outstanding shares of Zymark Corporation ("Zymark").  Id. ¶¶ 18, 23.  Zymark, which specialized in laboratory automation equipment used for drug discovery, continued as an operating business after its acquisition by ZYAC.  Pl. Reply App. Ex. G at 4.  In September of 1996, apparently in connection with ZYAC's acquisition of Zymark, BPSI acquired

---

[9] On January 4, 1990, the Graham Berwind Family Trusts contributed their BPSI stock to the Berwind Group Partners, which is owned by the Graham Berwind Family Trusts.  Joint Statement ¶ 11.  As of December 1999, the Berwind Group Partners was a general partnership that owned most, if not all, of the affiliated Berwind companies.  Joint Statement ¶¶ 12, 69.

[10] Both the DB Trust and the predecessor of the Berwind Group Partners contributed cash in exchange for the common stock of BPSI.  Joint Statement ¶ 9.

1,000 shares of ZYAC Series A 8.75% noncumulative preferred stock.  Joint Statement ¶ 20.  BPSI also advanced $20,000,000 to ZYAC under the terms of a note that bore interest at the prime rate ("ZYAC Note").  Id. ¶ 21.  BPSI never received any of the common stock of ZYAC.  Id.

### 3.  Litigation between the DB Trust and BPSI

Ultimately, the repeated efforts to acquire the DB Trust's interest in BPSI led to litigation.  In August 1999, the Berwind Corporation's president (who also served on BPSI's Board of Directors) sent David Berwind a letter stating:

> We are prepared to start a process that will result in our ownership of 100% of BPSI at a price to be determined by us and our financial advisors.  This will be a costly, time-consuming and legalistic process that we would prefer to avoid, but one that we are prepared to undertake, if necessary.

Id. ¶ 26.  In response, the DB Trust hired attorneys and advisors to negotiate the sale of its BPSI stock, id. ¶ 27, but those efforts proved unsuccessful.

On November 22, 1999, the DB Trust filed a complaint in the Federal District Court for the Eastern District of Pennsylvania; the case was captioned Warden v. McLelland, No. 99-5797 ("Warden Litigation").  Id. ¶ 28.  The complaint, served on December 9, listed the following defendants: (1) eight individuals, including Graham Berwind ("the BPSI directors"), each "in his capacity as a Director of [BPSI]"; (2) Graham Berwind "in his capacity . . . as Trustee" of the DB Trust;[11] (3) Bruce McKenney "in his capacity as Trustee" of the DB Trust; (4) the Berwind Group Partners; and (5)

---

[11] The parties dispute whether Graham Berwind remained a trustee of the DB Trust after the DB Trust rejected BPSI's 1997 offer to buy back its shares.  Joint Statement ¶ 17.  This fact is not material to resolution of the pending cross-motions for summary judgment.

Berwind Corporation.  Id. ¶¶ 29, 32.  The complaint set forth ten claims for relief, including a demand for a statutory appraisal under the dissenters rights provisions of Pennsylvania's BCL; civil conspiracy claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"); and derivative claims on behalf of BPSI against its directors for alleged breaches of their fiduciary duties.  Id. ¶¶ 29-30; Pl. Mot. App. Ex. K.

### 4. Merger of BPSI Acquisition into BPSI and the DB Trust's Invocation of Dissenters Rights

Shortly after being served the DB Trust's complaint, the Berwind Group Partners and the Berwind Corporation took steps to consolidate BPSI under the ownership of the Berwind Group Partners using the BCL short-form merger statute.  Joint Statement ¶¶ 35-36; Pl. Reply App. Ex. M at 4.  The merger operated as follows: On December 15, 1999, the Berwind Group Partners formed BPSI Acquisition Corporation ("BPSI Acquisition"), and both the Berwind Group Partners and Berwind Corporation transferred their BPSI stock to the newly formed entity.  Joint Statement ¶ 36.  In exchange, the Berwind Group Partners received all the shares of BPSI Acquisition, and Berwind Corporation received debt issued by BPSI Acquisition.  Id. ¶ 37.  BPSI then called all of its outstanding preferred stock for redemption and irrevocably deposited funds to pay for the redemption with First Union National Bank.  Id. ¶¶ 37-38.

As a result of the share exchange, BPSI Acquisition owned more than eighty percent of the outstanding shares of each class of BPSI stock.  Id. ¶ 34.  On the same day, BPSI Acquisition's Board of Directors, BPSI Acquisition's sole shareholder (i.e., the Berwind Group Partners), and BPSI's Board of Directors approved a merger agreement

to merge BPSI Acquisition into BPSI, with BPSI as the surviving company.  Id. ¶ 39.

Under the merger agreement, the Berwind Group Partners would receive all of the newly

issued common stock of BPSI in exchange for its stock of BPSI Acquisition.  The

agreement further specified that, in exchange for the 16.4% of BPSI shares owned by the

DB Trust, the DB Trust would receive the right to an $82,000,000 promissory note ("the

Promissory Note") or, alternatively, the fair market value of the stock as determined

under Pennsylvania's dissenters rights.  Id. ¶ 42.  Articles of Merger were filed with the

Pennsylvania Department of State the following day, December 16, 1999.  Id. ¶ 40.

The DB Trust disputed the value of the BPSI stock as determined by the other

parties to the merger, Compl. ¶ 8, and refused to accept the promissory note.  Pl. Reply

App. Ex. M at 2.  On January 4, 2000, the Trustees of the DB Trust filed an amended

thirteen count complaint ("Amended Complaint") making substantially similar claims as

the complaint filed in 1999.[12]  See Def. Mot. App. Ex. 4.  In addition, the Amended

Complaint sought a declaratory judgment that the Plan of Merger was null and void

(Count XII).  Id.  On January 13, 2000, the parties entered into a joint stipulation in

which the defendants agreed to maintain the capital structure of BPSI.  See Pl. Reply

App. Ex. N at 2.  This stipulation was subsequently extended through thirty days after the

---

[12] Among other things, the plaintiffs alleged that the defendants (1) caused BPSI to use
$30,000,000 of company assets to purchase an equity interest in Zymark for the benefit of
Berwind Group Partners, Berwind Corporation, and/or its affiliates; and (2) maintained
inordinate cash reserves in order to depress earnings and eliminate the DB Trust's interest at less
than fair value.  Def. Mot. App. Ex. 4, at 67, 73-74.

date of the district court's decision regarding the defendants' motion to dismiss the DB Trust's complaint.  Pl. Reply App. Ex. N at 2, n.1.

On January 25, 2000, the DB Trust exercised its dissenters rights under Pennsylvania law to demand the fair value of its BPSI stock.  Joint Statement ¶ 25.  As a result of that demand, and consistent with the Pennsylvania BCL, BPSI filed an action in state court seeking an appraisal of the fair value as of the merger date.  See Berwind Pharm. Servs., Inc. v. Warden, No. 000301250 (Phila. Cnty. Ct. Com. Pl. filed March 14, 2000).  On March 20, 2000, the appraisal action was removed to federal court and consolidated with the Warden Litigation.  In November 2000, the DB Trust hired an appraiser who concluded that as of 1999, a 16.4% interest in BPSI and Zymark was worth between $177,800,000 and $218,800,000 in the aggregate.[13]  Joint Statement ¶ 63; Pl. Reply App. Ex. G, at 5.

### 5.  The Third Circuit's Decision in Warden v. McLelland

The district court twice dismissed the federal action filed by the DB Trust against various individuals and the Berwind companies.  Both dismissals were reversed by the Third Circuit.  See Warden v. McLelland ("Warden II"), 288 F.3d 105 (3d Cir. 2002) (reversing district court's second dismissal); Warden v. McLelland ("Warden I"), 250 F.3d 737 (3d Cir. 2001) (reversing district court's first dismissal).  In its April 30, 2002 opinion remanding the case for the second time, the Third Circuit reinstated all of the DB

---

[13] The appraiser used three methods to develop a range of equity values of 100% of BPSI and, separately, 100% of Zymark.  See Pl. Reply App. Ex. G at 29, 50.  Depending on the methodology, the appraiser placed BPSI's value at between $711,800,000 and $1,460,000,000. Zymark was estimated as being worth between $66,500,000 and $414,500,000.

Trust's federal claims, including the DB Trust's claim to set aside the merger and its derivative claims against BPSI's directors.  Warden II, 288 F.3d at 115-16.

### 6.  Settlement of the Warden Litigation

On November 25, 2002, the parties settled the consolidated dissenters rights appraisal litigation and the Warden Litigation without any court having ruled on the merits of the various disputes.  Joint Statement ¶ 46.  This agreement resulted in BPSI paying $191,000,000 to the DB Trust on December 31, 2002.  Id. ¶ 64.  The settlement agreement provided, in relevant part, that the parties were to deliver the following items to an escrow agent: BPSI was to deliver the settlement amount of $191,000,000 in immediately available funds for the benefit of the DB Trust; the DB Trust was to deliver its BPSI stock certificates; the DB Trust was to deliver a general release in a form specified by the agreement; and all of the Warden defendants were to deliver general releases.  The parties also agreed to have all current litigation dismissed with prejudice. Id. ¶ 67; Def Mot. App. Ex. 10 at 139.

The DB Trust's General Release provided, in part, as follows:

In exchange for good [and] valuable consideration . . . each of the undersigned DB Trust Releasors . . . hereby release and forever discharge the Releasees . . . from any and all obligations, claims, debts, demands . . . of any nature whatsoever in law or in equity . . . whether based in tort, contract, statute, regulation, equitable principles or any other theory of recovery, direct or indirect, contingent or liquidated, or third party or derivative, which they or any of them ever had . . . against the Releasees or any of them . . . from the beginning of time to the date of this General Release, including but not limited to, all claims . . . arising from, relating to, or based upon any one or more of the following: A. The disputed December 16, 1999 merger of BPSI Acquisition Corporation with and into BPSI; B. The fair value of the shares of common stock of BPSI owned by the DB

Trust prior to the December 16, 1999 merger; and C. The matters asserted
or which could have been asserted in the [Warden Litigation].

Joint Statement ¶ 75.

The settlement agreement also required that the parties take certain actions prior to
the release by the escrow agent.  Among these actions, the DB Trustees and the Charles
Graham Berwind Trustees ("CGB Trustees") agreed to cooperate to obtain the approval
of the settlement agreement by the Orphans' Court.[14]  Id. ¶ 68; Def. Mot. App. Ex. 10 at
141.  Specifically, the settlement agreement provided that the DB Trust's petition to the
Orphans' Court was to "be supported by a valuation report of an investment bank or other
financial expert selected by the DB Trust regarding the value or range of values of the
interest and/or claim of the DB Trust in and to BPSI and ZYAC Holding Corporation . . .
and its wholly owned subsidiary, Zymark . . . ."  Joint Statement ¶ 68.  As noted above, at
the time of the merger BPSI held preferred stock and a note in ZYAC, which in turn
owned Zymark.

With regard to ZYAC and Zymark, Section 5 of the settlement agreement,
captioned "Ride-up Payment Obligations", provided that the Berwind Company
("TBC"), which was the successor entity to the Berwind Group Partners and the owner of
the ZYAC common stock, would give the DB Trust a right to a portion of any increase in
the value of ZYAC/Zymark computed from the date of the settlement if certain events

---

[14] Pennsylvania's Orphans' Courts supervise the administration of trusts and estates.  Pl. Reply
26 n.6.  None of the pleadings before the Orphans' Court are included in the record of this case.

occurred within five years beginning on the date of the settlement.  Id. ¶¶ 69-70.  Section

5(a) provided, in pertinent part, as follows:

> In the event that at any time after the date of this Agreement and prior to
> November 25, 2007 (the "Ride-up Period") there shall occur one or more of
> the following events (each, a "Zymark Triggering Event") . . . . and, as a
> result of any such Zymark Triggering Event, the Berwind Affiliates shall
> receive in the aggregate a Zymark Net Amount that exceeds the Zymark
> Base Amount for such Zymark Triggering Event, The Berwind Corporation
> will make an additional cash payment (a "Ride-up Payment") to the DB
> Trust in an amount determined in accordance with Annex I hereto, (the
> "Ride-up Annex"), which shall be deemed incorporated in and made part of
> this Agreement.

Id. ¶ 70.

The "Zymark Triggering Events" were, generally, sales by ZYAC or Zymark to a

third party of substantially all of their assets, sales of all or substantially all of ZYAC's or

Zymark's common stock to a third party, or other similar transactions resulting in a shift

of ownership of BPSI.  Id. ¶ 71.  Paragraph 2 of the Ride-up Annex defined "Zymark

Base Amount," in part, as the sum of $182,926,829 plus 13.2 % per annum interest from

the date of the settlement agreement to the closing of any Zymark Triggering Event,

compounded on each anniversary of the settlement agreement.  Id. ¶ 72.

In addition, the DB Trust received rights from TBC under Section 5(b) of the

settlement agreement to participate in any increase in the value of BPSI if certain

interests in BPSI were sold or transferred within five years of the settlement date.  Id. ¶

73.  In the event that such interests in BPSI were so sold or transferred, the DB Trust

would share in the excess of the "BPSI Net Amount" over the "BPSI Base Amount,"

which the settlement agreement defined, in part, as $838,181,191 plus 13.2 % per annum

interest from the date of the settlement agreement to the closing of any BPSI Triggering Event, compounded on each anniversary of the settlement agreement.  Id. ¶ 74.

According to the settlement agreement, both the Zymark Base Amount and the BPSI Base Amount were based on "(A) a capital contribution of $47,473,874 made by TBC to ZYAC on or immediately prior to the date [of the settlement], the proceeds of which have been paid to BPSI to repurchase the preferred stock of ZYAC held by BPSI and to repay the note of ZYAC held by BPSI, and (B) the payment of the Settlement Amount of $191,000,000 by BPSI to the Escrow Agent for the benefit of the DB Trust concurrently with the execution of this agreement."  Pl. Mot. App. Ex. M, at 6, 11.

Finally, the settlement agreement called for the parties to coordinate as to whether and how the settlement agreement would be reported for tax purposes.  If the parties could not agree, the agreement required "counsel to the DB Trust and counsel to BPSI and the Defendants [to] select an independent tax counsel to render a final opinion . . . which shall be governed by a 'more likely than not' standard, and the parties shall follow such opinion."  Joint Statement ¶ 78; Def. Mot. App. Ex. 10 at 161-62.  Although the parties were ultimately unable to agree on the precise tax treatment, both parties treated the 2002 payment as payment made entirely in exchange for the DB's Trust's BPSI Stock.  See Pl. Mot. App. Ex. 4 at ¶ 5(hh).[15]

---

[15] Despite agreeing that the settlement payment was in lieu of the DB Trust's interest in BPSI, the DB Trust has taken the position that BPSI was not obligated to pay the DB Trust until consummation of the settlement agreement in 2002.  As discussed above, if the payment obligation stemmed from the 2002 settlement agreement—rather than the 1999 merger—then payment would not have been made more than one year after the sale or exchange of property,

### 7.  IRS Notice of Proposed Adjustment

In BPSI's 2002 federal tax return, BPSI treated $31,103,795 of the 2002 settlement payment as interest by reducing the entire $191,000,000 to present value from December 31, 2002, to December 16, 1999.  Joint Statement ¶ 109.  BPSI deducted this interest component—along with other interest expenses—from its 2002 taxable income. Id. ¶ 111.  BPSI did not, however, itemize the interest expenses claimed on its 2002 return.  Id. ¶ 112.

On January 18, 2006, the IRS issued a Notice of Proposed Adjustment ("NOPA") to Colorcon (having changed its name), setting forth its legal theory that Colorcon was not entitled to deduct interest on the 2002 payment.  Id. ¶ 113.  The NOPA determined that "[t]he principal dispute between [Colorcon] and its former shareholders [sic] arose out of the redemption transactions."  Id.  The NOPA concluded that "[Colorcon] did not have unconditional and legally enforceable obligations to pay the former shareholders a principal sum that could be considered 'indebtedness' under § 163."  Id. ¶ 114. Moreover, the NOPA concluded that Colorcon "did not have a contract to purchase BPSI stock from the DB Trust.  Thus, IRC Section 483 [was] not applicable in this transaction."  Pl. Reply App. Ex. C.[16]

_____

Section 483 would therefore not apply, and the proceeds that the DB Trust received for its BPSI stock would be taxed as capital gains (rather than income due to interest).

[16] The parties do not presently dispute that the IRS's legal conclusion as to the existence of a contract was incorrect.  On February 11, 2013, this court ordered the parties to file supplemental briefs on the question of whether BPSI's 1999 filing of Articles of Merger constituted a "contract" for the purpose of applying 26 U.S.C. § 483.  See Order, ECF. No. 65.  In response,

On July 25, 2008, the IRS denied Colorcon's claimed interest deduction, assessed a tax deficiency of $10,883,874, deficiency interest in the amount of $5,463,576, and a penalty of $2,176,775.  Joint Statement ¶ 115.  On December 19, 2008, Colorcon paid the assessed deficiency, penalty, and deficiency interest.  Id. ¶ 116.  Colorcon filed a timely claim for refund (an amended return for 2002) on January 29, 2009, seeking the return of the $18,524,225 and statutory interest as provided by law.  Id. ¶ 117.  Colorcon claimed that, by virtue of the operation of both Pennsylvania and federal tax law, Colorcon was entitled to deduct the interest paid in 2002 to the DB Trust in the amount of $31,096,783, under IRC Section 483, because Colorcon had the unconditional legal obligation to pay interest to the DB Trust as part of the purchase price for the DB Trust's stock it acquired in 1999.  Colorcon asserted that that interest was deductible under Section 163 of the IRC.  Id. ¶ 118.

The IRS issued a notice of claim disallowance denying Colorcon's refund claims on June 1, 2009.[17]  Id. ¶ 119.  On September 10, 2009, Colorcon filed a timely complaint

---

counsel for the government conceded that a short-form merger can give rise to a payment obligation that may trigger interest under Section 483.  See Def. Supp. Brief, ECF. No. 67 at 4.

[17] Like Colorcon, for tax purposes the DB Trust treated the 2002 payment has having been made entirely in exchange for a redemption of the DB Trust's stock in BPSI.  Joint Statement ¶ 122. In 2008 the IRS determined a tax deficiency of $5,363,331 against the DB Trust for its 2002 taxable year.  This determination was premised on the same theory posited by Colorcon in the case at bar: that the DB Trust should have reported $31,103,795 in interest income because Colorcon became unconditionally indebted to the DB Trust for the fair market value of the DB Trust's stock as of the 1999 merger.  The DB Trust challenged the proposed assessment in an action filed in the United States Tax Court on October 28, 2008.  That action has been stayed pending final resolution of the plaintiff's suit presently before this court.  See Joint Statement 123-28.

in this court demanding a refund of $18,524,225 plus interest.  <u>Id.</u> ¶ 120.  Initial briefing

was completed on May 21, 2012, and supplemental briefing was completed on February

26, 2013.  Argument was heard on April 3, 2013.

## II.   DISCUSSION

### A. Standard of Review

In considering a motion for summary judgment, the court's role is to determine

whether there exists a genuine issue of material fact for trial, and not "to weigh the

evidence and determine the truth of the matter."  <u>Anderson v. Liberty Lobby</u>, 477 U.S.

242, 249 (1986).  Summary judgment is appropriate "if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law."  Rules of the United States Court of Federal Claims ("RCFC") 56(a).  The mere

fact that the parties have cross-moved for summary judgment does not establish the

existence or absence of disputed material facts.  <u>See</u> <u>Massey v. Del Laboratories, Inc.</u>,

118 F.3d 1568, 1573 (Fed. Cir. 1997) (noting parties may focus on different legal

principles that require analysis of different facts).  The court instead evaluates "each

party's motion on its own merits, taking care in each instance to draw all reasonable

inferences against the party whose motion is under consideration."  <u>Mingus Constructors,</u>

<u>Inc. v. United States</u>, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

A dispute of material fact is genuine "if the evidence is such that a reasonable

finder of fact could return a verdict for the nonmoving party."  <u>Johnson v. United States</u>,

79 Fed. Cl. 266, 270 (2007) (quoting <u>Liberty Lobby</u>, 477 U.S. at 248).  A party asserting

that a fact is genuinely disputed cannot rest on the allegations or denials of its pleadings.

See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (discussing summary judgment standard under Federal Rule of Civil Procedure 56(e)).  Rather, the party must support its assertions with actual evidence.  See Harper/Nielsen-Dillingham, Builders, Inc. v. United States, 81 Fed. Cl. 667, 674 (2008) (citing Long Island Sav. Bank v. United States, 503 F.3d 1234, 1244 (Fed. Cir. 2007)); Mingus, 812 F.2d at 1390 (finding that "mere denials or conclusory statements are not sufficient"); Arthur Venneri Co. v. United States, 180 Ct. Cl. 920, 927 (1967) (granting summary judgment where government failed to submit affidavits, documents or depositions to refute stipulated facts).  Moreover, the non-moving party does not automatically defeat a motion for summary judgment merely because it introduces some evidence that contradicts the moving party's claims.  Instead, the evidence submitted must be sufficiently probative to create a genuine issue of material fact to be tried.  See Liberty Lobby, 477 U.S. at 249-50 (summary judgment may be granted where evidence is merely colorable or not significantly probative); Invitrogen Corp. v. Clontech Laboratories, Inc., 429 F.3d 1052, 1080 (Fed. Cir. 2005).

     In the context of this suit, the parties' dispute is essentially two-fold.  First, the parties dispute whether a short-form merger that is subject to a suit for rescission should be treated, for the purposes of Section 483, as having been consummated as of the date of the merger, rather than as of the date when the suit for rescission is settled or a final judgment is entered.  Second, if Section 483 requires treating the settlement payment as resolving BPSI's obligation to pay the fair value of the DB Trust's shares in BPSI following the 1999 short-form merger, whether there is a genuine dispute as to how the $191,000,000 settlement payment should be allocated across the various claims in the

consolidated Warden Litigation and dissenters rights action.  In resolving these questions, the court is also mindful that the taxpayer carries the burden to prove, by a preponderance of the evidence, that the assessment was erroneous and the amount, if any, of the tax.  <u>See</u> <u>Consol. Edison Co. v. United States</u>, 703 F.3d 1367, 1377-78 (Fed. Cir. 2013) (citing <u>United States v. Janis</u>, 428 U.S. 433, 440-41 (1976)); <u>W. Mgmt., Inc. v. United States</u>, 101 Fed. Cl. 105, 113 (2011), <u>rev'd in part on other grounds</u>, 498 F. App'x 10 (Fed. Cir. 2012).

### B.  The December 16, 1999 Short-Form Merger Was a Sale or Exchange of Property for the Purposes of Section 483 and Was Not Superseded by the 2002 Settlement Agreement

The plaintiff relies on <u>Jeffers v. United States</u>, 556 F.2d 986, 997 (Ct. Cl. 1977), to argue that the 1999 short-form merger meets the definition of the term "sale" within the meaning of Section 483, thereby requiring interest imputation on any payments made a year or more from that date.  In <u>Jeffers</u>, the Court of Claims treated a short-form merger as a contract for the sale of property.  <u>Id.</u> at 993-94 (Section 483 applies "to any deferred payment on account of a sale or exchange of capital or depreciable property . . . . Congress intended the section to have far-reaching consequences on the entire Internal Revenue Code").  The plaintiff further argues that under the Pennsylvania BCL, the subject merger was effective upon the filing of the Articles of Merger because a different date was not specified.  Specifically, the Articles of Merger in the case at bar expressly stated that they would be effective upon filing, which occurred on December 16, 1999. The plaintiff concludes that in such circumstances, the DB Trust, as of December 16, 1999, had an unconditional right to be paid either the consideration offered by BPSI or

the amount determined by a court under the BCL's dissenters rights provisions.  Pl. Mot.

19-20.  According to the plaintiff, because the undisputed evidence establishes that the

$191,000,000 payment was paid by Colorcon to satisfy the DB Trust's dissenters rights

and because the payment was made more than one year after the redemption of the DB

Trust's shares, Colorcon was required to impute interest on the settlement payment.  Pl.

Mot. 13-14, 25.

     While the government does not dispute that the 1999 merger effected a sale or

exchange of property,[18] the government argues that Section 483 was not triggered in this

case because the 2002 settlement agreement superseded any payment obligation of

Colorcon for the DB Trust shares in BPSI under the 1999 merger.  Def. Reply 1, 11-16.

According to the government, because the 1999 merger was challenged, and the parties

settled the litigation prior to a final judgment, the court must treat the DB Trust's claim

for rescission in the Warden Litigation as if it had been granted.  As such, the government

contends that the $191,000,000 payment could not have been made to satisfy a payment

obligation stemming from the merger in 1999, but rather was consideration as part of a

settlement agreement that was consummated in 2002.  In support of its position the

government relies primarily on Lyeth v. Hoey, 305 U.S. 188 (1938).

     In Lyeth, heirs challenged a will alleging a lack of testamentary capacity and

undue influence.  Id. at 189.  The case was settled for $200,000 prior to trial.  Id. at 190.

Despite Lyeth's contention that the $200,000 settlement was excludable from taxation as

---

[18] See supra note 16.

an "inheritance," the Commissioner of Internal Revenue assessed income tax on the

settlement payment.  The Second Circuit agreed with the IRS that the settlement was

taxable because under Massachusetts law a settlement payment is considered to be a

contract, which would normally be subject to federal tax.  See Lyeth v. Hoey, 96 F.2d

141, 143 (2d Cir. 1938).  The Supreme Court reversed, holding that resort to state law

characterizations was unnecessary and impermissible absent a federal revenue statute that

expressly or impliedly depended on the operation of state law.  Lyeth, 305 U.S. at 193-

95.  The Supreme Court then determined that because Congress had broadly excluded

from federal taxes any property acquired by succession to a decedent's estate, resort to

Massachusetts law was unnecessary to properly characterize the settlement of an

inheritance claim for federal revenue purposes.  Id. at 194-97.  In reaching this result, the

Supreme Court—in a passage heavily relied upon by the government—stated that:

> It does not seem to be questioned that if the contest had been fought to a
> finish and petitioner had succeeded, the property which he would have
> received would have been exempt under the federal act. . . .  We think that
> the distinction sought to be made between acquisition through such a
> judgment and acquisition by a compromise agreement in lieu of such a
> judgment is too formal to be sound, as it disregards the substance of the
> statutory exemption.

Id. at 196.

    The government contends that Lyeth requires, when characterizing settlement

payments, the court to treat a plaintiff's request for an equitable remedy as having been

granted.  See Def. Reply 4-5.  The government continues that, because the Warden

litigation included a request for rescission, the court should treat the 1999 short-form

merger as either void ab initio or voided, and therefore conclude that the entire

$191,000,000 settlement payment was pursuant to an agreement arising in 2002.  Thus, the government argues that the 1999 merger is irrelevant and the 2002 settlement is the defining contract for purposes of applying Section 483.

For the reasons that follow, the court agrees with the plaintiff and finds that the government's reliance on dicta in Lyeth is misplaced.  The court does not read Lyeth as supporting the government's contention that "a taxpayer may not treat [a] payment as attributable to a transaction the validity of which was challenged in the settled lawsuit, as if the suit had not been filed."  Def. Mot. 18.  Lyeth merely held that where Congress had broadly excluded from taxation any property acquired through the distribution of a decedent's estate, it was unnecessary and improper to resort to Massachusetts law to characterize the settlement payment resolving a will contest.  As the Court of Claims explained in Parker v. United States, 573 F.2d 42, 47 (Ct. Cl. 1978):

> Lyeth seems but a specialized application of the familiar concept that, in determining the tax characteristics attributable to amounts received under a court judgment, the crucial question to be resolved is 'In lieu of what were the damages awarded?' . . . Lyeth established that the question is equally important in determining the true nature of proceeds received in settlement of estate litigation.

Id.

Moreover, because Section 483 does not define the terms "sale" or "exchange," it is necessary to look to Pennsylvania's BCL to determine whether the 1999 short-form merger effected a transfer of property by operation of law.  See Lyeth, 305 U.S. at 194 (state law may control if federal taxing act implicates a dependence on operation of state law).  Accord Williams v. Comm'r, 1 F.3d 502, 505 (7th Cir. 1993) ("Section 483 simply

attaches federal tax consequences to a transaction defined by state law.").  As such, the court rejects the government's contention that the 1999 short-form merger must be deemed "rescinded," for Section 483 purposes, because the validity of the merger was challenged.

The court finds, as a matter of law, that at least part of the $191,000,000 settlement was paid in lieu of DB Trust's shares redeemed by BPSI through the 1999 short-form merger.  The government is asking the court to ignore completely the uncontroverted facts that (1) the DB Trust sought to receive the fair value of its shares by invoking its dissenters rights under the BCL; (2) the DB Trust obtained an appraisal of the 1999 value of its interest in BPSI; and (3) BPSI subsequently filed a statutory appraisal action that was removed and consolidated with the Warden Litigation.  In the absence of any probative evidence supporting the government's contrary assertions, the defendant is not entitled to summary judgment.

### C.  The Government Has Not Raised a Genuine Dispute as to Whether the Entire $191,000,000 Settlement Payment Was Attributable to the DB Trust's Dissenters Rights

As noted above, to determine the Federal tax character of a settlement payment, courts must determine "in lieu of what were the damages awarded." Parker, 573 F.2d at 47.  The "in lieu of what" inquiry "focuses on the origin and characteristics of the claim settled." Green v. Comm'r, 507 F.3d 857, 867 (5th Cir. 2007).  Relevant factors in making this determination include the claims and the manner in which the agreement calculates the payment. Grier v. United States, 207 F.3d 322, 330 (6th Cir. 2000).

The government argues that even if the settlement resolved the DB Trust's claim for dissenters rights, the 2002 settlement payment also included compensation for other claims on which Colorcon could not impute interest and therefore the plaintiff's motion for summary judgment must be denied.  In support of this argument, the government points to the general release contained in the settlement agreement, which provides that for valid consideration the parties resolved all "matters asserted or which could have been asserted in the actions captioned Warden v. McLelland et al., Civil Action No. 99-CV-5797 and Berwind Pharmaceutical Services, Inc. v. Warden et al., Civil Action No. 00-CV-1445, pending in the U.S. District Court for the Eastern District of Pennsylvania." Def. Mot. 36.[19]  In addition, the government relies on the requirement for the DB Trust and the CGB Trust to file with the Orphan's Court a copy of the settlement agreement, as well as valuation reports of the DB Trust's interest in BPSI, ZYAC, and Zymark.  Def. Mot. 32.  The government argues that the $191,000,000 payment must be attributed to more than the dissenters rights appraisal action because these clauses of the settlement agreement concerned matters other than the appraisal action that was consolidated with the Warden Litigation.

The government similarly contends that the settlement agreement's references to the DB Trust's rights in ZYAC and Zymark must mean that the settlement payment included money for resolving claims other than the appraisal action, because the DB

---

[19] The government similarly relies on the settlement agreement's requirement that the DB Trust and its beneficiaries execute and deliver to the Warden defendants, Colorcon's counsel, and ultimately the Orphan's Court an additional release and indemnification agreement.  Def. Mot. 36.

Trust only owned BPSI stock.  In this connection, the government refers to the language in the settlement agreement which provides a "Ride-up payment" to the DB Trust if the value of ZYAC/Zymark increases based on certain events (such as sale) within 5 years.[20]

The plaintiff responds that the government's suggestion that the $191,000,000 payment covers more than the value of the DB Trust's stock redeemed through the 1999 short-form merger is not supported by any evidence.  According to the plaintiff, the DB Trust's sole claim against BPSI was for the value of the dissenters rights obligation.  The derivative claims and RICO claims were against BPSI's directors or other individuals. The plaintiff contends that BPSI's payment of $191,000,000 must, therefore, have been made solely in lieu of the one claim—dissenters rights—for which BPSI faced liability. Indeed, the plaintiff asserts that both BPSI (now Colorcon) and the DB Trust have always treated the 2002 payment as compensation for the dissenters rights that arose when BPSI redeemed the DB Trust's stock in 1999.  With regard to the Ride-up Agreement for Zymark and ZYAC, the plaintiff contends that TBC—not BPSI—was the party liable to the DB Trust with regard to those payments under the terms of the settlement agreement. It is for this reason, Colorcon argues, that the Ride-Up agreement has no connection to the $191,000,000 payment and is irrelevant to the plaintiff's tax claim.

---

[20] The government also suggests that the appraisals submitted to the Orphan's Court in connection with both BPSI and ZYAC and Zymark demonstrate that resolution of claims involving ZYAC and Zymark must have been covered by the $191,000,000 payment.  See Def. Mot. 34, 36-37.  As noted above, the court has not seen any of the filings before the Orphan's Court and the government's speculation as to the makeup of the $191,000,000 payment, based on undisclosed submissions to the Orphan's Court, is not enough to establish a genuine issue of material fact.  See Long Island Sav. Bank, 503 F.3d at 1244.

The court agrees with the plaintiff.  After carefully reviewing the record, the court concludes that a trial is not necessary because there is no genuine dispute as to the purpose of the $191,000,000 settlement payment.  In order to establish an issue of fact for trial, the government was required to support its reading of the settlement agreement with actual evidence to show that BPSI's $191,000,000 payment to the DB Trust included a "payment" for more than the value of the DB Trust's redeemed shares.  See Liberty Lobby, 477 U.S. at 503 F.3d at 1244 (summary judgment may be granted if evidence merely colorable or not significantly probative).  The government has failed to do so.

The undisputed facts demonstrate that (1) in November 2000 the DB Trust hired an appraiser who valued a 16.4% interest in BPSI; (2) BPSI alone paid the $191,000,000 settlement based on the appraisal to the DB Trust; (3) under the settlement agreement, TBC—not BPSI—was liable for making additional payments to the DB Trust in the event that a Zymark/ZYAC triggering event occurred under the Ride-up provision; and (4) the $191,000,000 settlement payment has been consistently characterized by both the DB Trust and BPSI (now Colorcon) as representing only the value of the DB Trust's BPSI shares.[21]  See supra note 17.  Accordingly, the government's unsupported assertion that there is a genuine dispute as to how the $191,000,000 payment should be apportioned among the DB Trust's various claims in the consolidated litigation must be

---

[21] As noted above, the BPSI base amount was based on a $47,473,874 payment by TBC to ZYAC in order to repurchase BPSI's stock and debt interests in ZYAC.  This payment, which was to be made prior to the effectuation of the settlement agreement, was separate from the $191,000,000 settlement payment.  Pl. Mot. App. Ex. M, at 6, 11.

rejected.[22]  See RCFC 56(c)(1) (party asserting that a fact is genuinely disputed must

support the assertion by either citing to particular materials or by showing that the

materials do not establish the absence of a genuine dispute).  The uncontroverted facts

establish that the subject payment was made by BPSI solely in lieu of the value of the

BPSI stock held by the DB Trust prior to the 1999 short-form merger's effectuation.  See

Greco v. Dep't of the Army, 852 F.2d 558, 560 (Fed. Cir. 1988) (intent of parties to

settlement agreement controlling).

Having concluded that (1) BPSI merged with BPSI Acquisition in December 1999

pursuant to the short form merger statue of the Pennsylvania BCL; and (2) BPSI's

$191,000,000 settlement payment was made solely "in lieu" of its obligation to

compensate the DB Trust for the shares redeemed under that 1999 merger; the court now

concludes that the plaintiff has established that it correctly imputed interest on the

deferred $191,000,000 payment.[23]  See 26 U.S.C. § 483; 26 C.F.R. §§ 1.483 et seq.

(Section 483 applies to sale or exchange of property if one or more payments is due more

than 1 year after date of the sale or exchange, and the contract does not provide for

---

[22] The government's focus on the number of claims lodged by the DB Trust suggests that its
argument is actually premised on the potential inadequacy of the consideration that the DB Trust
received in exchange for its general release (i.e., mutual releases from liability from the other
Warden defendants and the ride-up agreement).  See Def. Mot. 30-31, 39-41.  Yet even mutual
releases can constitute valid consideration, see Campbell v. Snap-On Tools Corp., 941 F.2d 677,
678 (8th Cir. 1991) (per curiam), and the government has not presented any evidence of fraud or
misrepresentation in the settlement that would allow the court to evaluate the sufficiency of the
consideration furnished.  See Axion Corp. v. United States, 68 Fed. Cl. 468, 476 (2005) (citing
Silverman v. United States, 230 Ct. Cl. 701, 711 (1982)).

[23] The parties do not dispute that the payment occurred more than one year after the merger's
effectuation date, or that the merger did not provide for adequate stated interest.  As such, all of
the requirements of Section 483 are satisfied.

adequate stated interest).  Because the parties agree that the plaintiff computed its interest in a manner consistent with the method of computing interest under Section 483, Joint Statement ¶ 110 (current inclusion in income of original issue discount), the plaintiff has carried its burden of showing that the IRS's assessments and penalties were erroneous as a matter of law.[24]

## III.    CONCLUSION

For the foregoing reasons, Colorcon's motion for summary judgment regarding its entitlement to the disputed interest deduction, deficiency interest, and the inapplicability of the substantial understatement penalty is **GRANTED** and the government's cross-motion for summary judgment is **DENIED**.  Accordingly, the clerk is directed to enter judgment in favor of the plaintiff in the amount of $18,524,225, plus interest as provided by statute.  Each party to bear its own costs.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[24] Having concluded that the entirety of the $191,000,000 settlement payment was made to compensate the DB Trust for its interest in BPSI, the court does not reach the plaintiff's alternative contention that, to the extent the settlement included payment to settle the DB Trust's derivative claim, the amount attributable to that claim would simply be a valuation point in determining the full value of the BPSI stock.  Similarly, the court does not reach the plaintiff's alternative contention that any portion of the $191,000,000 payment that might have been attributable to settling the RICO or other claims by the DB Trust against BPSI officers and paid by BPSI on behalf of those officers would have been deductable in any event under other code provisions.